*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 16-CF-1134

ANTWON D. PITT, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF1-17598-15)

(Hon. Florence Y. Pan, Trial Judge)

(Argued December 4, 2018                    Decided December 5, 2019)

*Stefanie Schneider*, Public Defender Service, with whom *Samia Fam* and *Alice Wang*, Public Defender Service, were on the brief, for appellant.

*Daniel J. Lenerz*, Assistant United States Attorney, with whom *Jessie K. Liu*, United States Attorney, *Elizabeth Trosman*, *Nicholas P. Coleman*, and *Sarah D. McClellan*, Assistant United States Attorneys, were on the brief, for appellee.

Before FISHER and EASTERLY, *Associate Judges*, and FERREN, *Senior Judge*.

Opinion for the court by *Senior Judge* FERREN.

Dissenting opinion by *Associate Judge* EASTERLY at page 47.

FERREN, *Senior Judge*:  Appellant Antwon Pitt was convicted of raping D.B. while burglarizing her home on October 13, 2015.[1]  He argues on appeal that the trial court committed two reversible errors.  First, appellant, who testified in his own behalf, challenges the trial court's ruling that permitted the government to cross-examine him about another untried burglary he committed a week earlier, on October 6, 2015 – allegedly impermissible evidence of propensity to burglarize.[2]  Second, appellant challenges the trial court's dismissal of Juror 5 due to her observable illness after the court received a note that an unidentified juror had questioned whether a rape had occurred.  Finding no abuse of discretion, we affirm appellant's convictions.

## I.  Other Crimes Evidence

"It is essential, . . . to the proper functioning of the adversary system that when a defendant takes the stand, the government be permitted proper and

---

[1]  Appellant was convicted of first degree burglary, kidnapping, assault, threatening to kidnap, two counts of first degree sexual abuse, threatening to injure or kidnap, and robbery as a result of this incident.

[2]  Before the trial of the October 13 incident in which this evidence was introduced, the government agreed to the defense request to sever the trials of the October 6 burglary and the October 13 rape and burglary.  After his conviction for the October 13 crimes, appellant pleaded guilty to the October 6 crime.

effective cross-examination in an attempt to elicit the truth."[3]  Prosecutors may cross-examine as to both "the facts asserted by the defendant in testimony" and the "reasonably related . . . inferences . . . drawn from the direct testimony."[4] Moreover, "we recognize that the evaluation and weighing of evidence for relevance and potential prejudice is quintessentially a discretionary function of the trial court, and we owe a great degree of deference to its decision."[5]  Thus, we review the trial court's determinations defining the extent and scope of the prosecution's cross-examination of appellant's testimony for abuse of discretion.[6]

**A. Testimony and Objections at Trial**

**1.  The Government's Evidence**

D.B. testified for the government that, on October 13, 2015, she was working from her apartment in Southeast Washington and "forgot to lock [the] door that day."  Shortly after 2 p.m. she discovered a man in her front hallway,

---

[3] *United States v. Havens*, 446 U.S. 620, 626-27 (1980).

[4] *Flores v. United States*, 769 A.2d 126, 131 (D.C. 2000) (quotation marks omitted).

[5] *Johnson v. United States*, 683 A.2d 1087, 1095 (D.C. 1996) (en banc).

[6] *See Wesley v. United States*, 547 A.2d 1022, 1025 (D.C. 1988).

"6'3 to 6'5" tall, "black, maybe medium to dark skin tone," with "short natural hair," wearing a "light to medium gray" T-shirt "with a logo" or "geometric shapes" over another "short sleeve" shirt and "gray denim" pants.

The man said that he was there looking for someone and asked if her husband was home or coming back soon. D.B. replied that her husband was not home, and the man then grabbed her by the "throat, very, very tightly and very, very hard," covered her mouth, and pushed her down the hallway to her bedroom. D.B. attempted to remove the man's fuzzy gloves, hooking her finger inside of one of the gloves before her attacker removed her hand. Overpowered and threatened with death for resisting, D.B. realized that the man was raping her, and she demanded that he put on a condom. He did so and resumed the rape. D.B.'s rapist left with her cell phone, checks belonging to her husband, and cash.

D.B. immediately e-mailed her husband and then other family members, a neighbor, and finally her boss, who was first to respond and call the police. D.B. was taken to the hospital where she was examined and treated for rape, damage to her throat, broken facial bones, and other injuries.

Around the time of the burglary and rape, a neighbor smoking in the alley behind D.B.'s building saw a man exit with a backpack and head toward Independence Avenue. Appellant was viewed by surveillance cameras on Independence Avenue and in the Metrorail System.

Late that night, law enforcement personnel traced D.B.'s cellphone to a gas station in Maryland, where appellant was recognized by his description and an image from the surveillance cameras. After a struggle, flight, and continued resistance, appellant was arrested. D.B.'s cellphone was found in appellant's pants while the checks belonging to her husband, as well as fuzzy gloves, were recovered from his backpack, along with other items.

An expert witness testified for the government that appellant's DNA was found in the gloves, and that D.B.'s DNA was found on three finger tips and the inside cuff of one of the gloves. On cross-examination, defense counsel elicited the expert's testimony about DNA "transference" from one surface to another.

**2. Appellant's Direct Examination**

Appellant elected to testify that his cousin, Delonte, had driven him into the District of Columbia from Bowie and dropped him off to visit a friend with plans to head back to Maryland to visit appellant's brother that afternoon. Meeting back up with Delonte an hour later, appellant discovered that his cousin had lent the car to a friend. According to appellant, they were walking to the Stadium Armory Metro when they came to D.B.'s building, and his cousin said, "I got a man that live in this building right here. Wait right here." Appellant claims that he waited by the adjacent alley smoking marijuana while his cousin entered the building. Appellant testified that twenty minutes later his cousin left the building, said something to someone appellant could not see, met appellant in the alley, handed appellant a cellphone and checks, told him to sell the items as he "had done [on] previous transactions with him before," then said something had come up and abruptly headed off in a different direction.

Appellant admitted that he then exited the alley to Independence Avenue where he first appeared on the surveillance footage introduced in evidence putting on his jacket, took the Metro from Stadium Armory to Suitland, was unable to get in touch with his brother, and returned to Gallery Place to try (unsuccessfully) to

sell "some of the stuff" he had received from his cousin before heading back toward Bowie. Appellant further testified that he had used his gloves to wipe his finger prints off D.B.'s cellphone after using it to call his brother so that it could not be traced back to him, as he was on probation for robbery and assaulting a police officer in 2013. He also acknowledged two misdemeanor convictions for weapon possession and failure-to-appear in 2013 as well as an earlier assault conviction in Georgia when he was seventeen. Finally, appellant stressed that he had used gloves to handle the stolen property and explained that his fight and flight reactions when law enforcement officers caught up with him were due, in part, to the fact that he "was currently on probation." (Appellant's pretrial report, not before the jury, states that he had most recently been released on probation from federal custody for his 2013 robbery and assault convictions on July 29, 2015.)

### 3. Cross-Examination of Appellant

The government then asked the trial court, outside the presence of the jury, for permission to present physical evidence of the October 6, 2015, burglary, found alongside D.B.'s husband's checks from the October 13 rape and burglary, as well as appellant's fuzzy gloves. The prosecutor argued that the defense had "completely opened the door" to cross-examination about the October 6 burglary

and "the rest of the property that [appellant] had on him" to rebut "the suggestion that [appellant] acted as the middleman in these types of transactions." Thus began a lengthy midtrial discussion among the court, the prosecutor, and defense counsel that resulted in a full-day hearing (with the jury excused) about what legal theory supported admission of the October 6 burglary.

Initially, defense counsel observed that, to demonstrate appellant was not a mere fence – that he also stole property – the government could cross-examine him about his admitted robbery conviction, whereas evidence of the October 6 burglary would be highly prejudicial and unnecessary. Focusing, next, on specific exceptions to the traditional bar against admission of other crimes evidence, defense counsel stressed that the October 6 burglary involved appellant's going into a woman's bedroom and taking her phone while she slept – a scenario showing that the October 6 burglary was too different from the October 13 rape and burglary to be admissible as identity evidence.[7] The court then turned the discussion to whether the October 6 burglary could be used, instead, to impeach appellant's testimony and how far the government "should be able to" go to

---

[7] *See Cantizano v. United States*, 614 A.2d 870, 874 (D.C. 1992) (Evidence of another crime may be admitted to "prove identity" when the "crimes involved are classic signature crimes with an unusual modus operandi such that there is a reasonable probability that one person committed all the offenses.").

"complete [that] impeachment." Defense counsel replied that any inquiry into that burglary should be limited to asking whether, on October 13, appellant had "other stolen property" on him. According to counsel, only if appellant answered "yes" but denied stealing the property should the issue of proving his alleged October 6 thefts "extrinsically" arise. The court agreed that this was an appropriate starting point, but asked for additional argument before ruling on what questions the government would be allowed to ask.

Defense counsel responded that night with a written objection arguing that appellant had not "open[ed] himself to impeachment with propensity evidence simply by testifying." Nor, wrote counsel, was the October 6 burglary admissible as "identity" evidence, as there was "no shared distinctive signature" creating the required similarity of the October 6 and 13 crimes. The next morning, defense counsel renewed appellant's general objection to any question about the October 6 burglary, arguing that it is never "proper impeachment to use propensity evidence" or "to prove it up substantively" or "extrinsically."

Disagreeing with defense counsel's "repeated characterization" of the issue as "propensity" rather than relying on October 6 evidence to contradict "the inference of [appellant's] testimony," the trial court took a short recess to review

"all the cases" presented by the parties before ruling. When the proceeding resumed, the court began by rejecting "identity" and "intent" as grounds for its decision.[8] Next, as background for its ruling, the court observed that the government was "seek[ing] to introduce evidence that on October 6, 2015, about a week before the events in this case, [appellant] committed a burglary at approximately five or 6 a.m. in which he entered [a] woman['s] room while she was sleeping. She awoke. He took her cell phone and left."

Relying on *Havens*, *Kinard*, *Wesley*, and *Raper*[9] for the proposition that cross-examination of a defendant's direct testimony may be very broad, the trial court ruled that, "to the extent" evidence of the October 6 burglary "refutes the implication that [appellant] was just a fence who sells items stolen by Delonte," and "only does small crimes now like smoke weed and receive stolen property," such evidence would come in "under [an] impeachment theory." The court added that appellant's testimony had "open[ed] the door to inquiry about all the items he

---

[8] *See id.*; *see generally Drew v. United States*, 331 F.2d 85, 90 (D.C. Cir. 1964) (Other crimes evidence may be admitted if "relevant to (1) motive, (2) intent, (3) absence of mistake or accident, (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of the one tends to establish the other, and (5) the identity of the person charged.").

[9] *Havens*, 446 U.S. at 626-27; *Kinard v. United States*, 635 A.2d 1297, 1305-06 & n.17 (D.C. 1993); *Wesley*, 547 A.2d at 1024-25; *United States v. Raper*, 676 F.2d 841, 846 (D.C. Cir. 1982).

had in his possession when he was arrested[,] which included another burglary victim's cell phone." The court thus ruled that the government could use the October 6 burglary to impeach appellant's "carefully crafted" testimony (a) describing "his arrangement to fence or sell stolen items," (b) emphasizing the "age" of "his prior convictions," (c) using the fact that he was "in violation of his probation" to explain his actions, and, on that foundation, (d) denying "raping, beating[,] and choking" D.B. on October 13.

The court, however, did not approve admission of the October 6 burglary wholesale. While holding that the "probative value of the overall burglary [on October 6] substantially outweigh[ed] the prejudicial effect," the court announced that October 6 evidence would be considered for admission piece by piece in the court's "discretion." Recognizing the importance of sensitivity to the potential prejudice as well as the probative value of each aspect of the October 6 burglary, the court stressed: "I would be remiss [unless] I would withhold ruling on that [evidence] until I hear how the testimony goes."

The court then offered defense counsel a final opportunity to request "any additional findings of fact or conclusions of law" before cross-examination of appellant began. In response, defense counsel posed one additional question about

physical evidence: whether the government intended to ask about a knife and rope that were also found in appellant's backpack. The prosecutor's reply alleviated counsel's concern.

At this point, appellant's general objection to admission of all the evidence from October 6 was no longer in play. Rather, the trial court established a regime of cross-examination in which the government would ask appellant questions derived from the October 6 burglary, each subject to objection and a corresponding ruling. The trial court thus proceeded from the premise that, for impeachment purposes, specified evidence from the October 6 burglary would be admissible if more probative than prejudicial.

Thereafter, once the jury had returned to the courtroom and appellant had retaken the stand, the government proceeded to ask him about items retrieved from his backpack (but not yet connected to the October 6 burglary). Defense counsel eventually renewed specific objections to admission of that physical evidence, which the court denied.

The court then permitted questions by the prosecutor about how appellant had portrayed himself as someone who did not "actually do the job of" stealing.

Appellant, however, replied: "If you [are] asking me did [I] receive th[is] property from other people, I would tell you no." The government went on to reveal the October 6 burglary for the first time by asking – without further objection – whether the newly admitted exhibits were in fact "items that [appellant] went inside of [another woman's] home . . . and took from her bedroom while she was sleeping." Appellant responded that he had done so, at an unknown early morning hour, and, in response to the government's final question, confirmed his possession of those items from October 6 until his arrest on October 14.

**4. Redirect Examination of Appellant and Closing Argument for the Defense**

Defense counsel opened redirect-examination by eliciting appellant's testimony that he had left the October 6 burglary without assaulting the woman he had inadvertently found asleep in her bedroom. Relying on that testimony later, in closing argument, defense counsel urged the jury to find "reason to doubt that" appellant was "the man who committed the crimes charged here," because on October 6 appellant "got out of there. He didn't touch that woman. He didn't hit that woman. He certainly didn't rape that woman."

**5. Instructions and Closing Argument for the Government**

Earlier that afternoon the court addressed the government's request to respond to that closing by the defense. The court made clear that the October 6 burglary "was admitted to assess the credibility of [appellant's] testimony" and that the government could "argue it in a way that goes to the credibility of [his] story" without saying that "he committed the burglary the first time and therefore [the jury] can conclude he committed the burglary the second time."

The trial court instructed the jury that evidence of the October 6 burglary "was admitted for the limited purpose of impeaching [appellant's] credibility" and that appellant could not be convicted "simply because [the jury] believe[d] [that] he may have done bad things not specifically charged as crimes in this case."[10]

---

[10] In the full instruction given after appellant's impeachment, the court instructed the jury that it had "heard evidence that [appellant] admitted committing a burglary on October 6th," and:

> I want to instruct you that that evidence was admitted for the limited purpose of impeaching his credibility. Evidence of the October 6th burglary may not be used to conclude that he was the assailant in the charged October 13th attack in this case. It goes only to the credibility of

(continued . . .)

_____
(. . . continued)

       [appellant's] claims on Direct.  You may use it only for that purpose and for no other purpose.

In the final instructions given before deliberations began, the court instructed the jury that:

> Impeachment by proof of conviction of crimes.  You have heard evidence [that appellant] has previously been convicted of crimes. These prior convictions are admitted into evidence solely for your consideration in evaluating his credibility as a witness.

> The evidence that he was convicted of crimes in the past is not evidence that [appellant] is guilty of the offenses charged in this case and you must not draw such an inference.

> Other crimes evidence.  You have also heard evidence that [appellant] committed a burglary a week prior to the offenses charged in this case and he had proceeds of that burglary when was arrested by the police.

> It is up to you to decide whether to accept that evidence.  If you find that [appellant] committed that prior burglary, you may use that evidence only for the limited purpose of judging the credibility of [appellant's] testimony.  You may not use this evidence for any other purpose.

> [Appellant] is only on trial for the crimes charged.  [Appellant] is not charged in this case with any offense related to the prior burglary. You may not use this evidence to conclude that [appellant] has a bad character or that [appellant] has a criminal propensity.

(continued . . .)

The government's closing argument adhered to this line, stressing that the jury should not confuse the October 6 and October 13 crimes; it should use the October 6 burglary only to assess the credibility of appellant's "story about being a middle man" and his explanations for some of the other physical evidence against him for the October 13 crimes.

## B. Discussion

### 1. Law Applicable to Admission of Other Crimes Evidence

"The jury's knowledge of a defendant's unrelated past [criminal or wrongful] behavior raises the obvious danger that the jury will infer a disposition on the part of the defendant toward criminal activity and thus find him guilty of the crime charged."[11]  Accordingly, "evidence of other crimes, which are independent of the one charged, is inadmissible unless it comes under one or more well

_____

(. . . continued)

> The law does not allow you to convict a [d]efendant simply because you believe he may have done bad things not specifically charged as crimes in this case.

[11] *Campbell v. United States*, 450 A.2d 428, 430 (D.C. 1982).

recognized exceptions."[12] This means that other crimes evidence "must be admissible for some legitimate purpose other than to prove the accused's propensity to commit the act in issue."[13] Moreover, "even when evidence of wrongful behavior is relevant" to a legitimate purpose, the trial court must exclude it "when the degree of prejudice exceeds the probative value of the evidence."[14] More specifically, exclusion is required when anticipated prejudice to the defendant from the jury's likely inference of criminal propensity exceeds the probative value for reaching the truth through impeachment of the defendant's testimony with evidence of another crime committed by that defendant.

---

[12] *Id.*; see, e.g., *supra* note 8.

[13] *Campbell,* 450 A.2d at 430; *accord, Thompson v. United States*, 546 A.2d 414, 420 (D.C. 1988) ("The propensity rule does not, of course, preclude the admission of evidence of other crimes when such evidence is relevant to issues other than the defendant's predisposition to commit the crime."); *Jones v. United States*, 385 A.2d 750, 752 (D.C. 1978) ("We have long observed the rule that unless and until a defendant takes the stand or otherwise places his character in issue, evidence of a defendant's prior illegal activity is generally inadmissible because of its prejudicial impact.").

[14] *Campbell,* 450 A.2d at 430; *accord, Thompson*, 546 A.2d at 420 (If the trial judge determines that "a genuine and material issue has been raised" as to which other crimes evidence is relevant, "the judge must determine, in the careful and informed exercise of his discretion, whether the prejudicial effect of the evidence exceeds the probative value[,] and he must exclude it if it does.").

Appellant's October 6 burglary does not fit the usual permissible uses of other crimes evidence approved in *Drew*.[15] Rather, this case concerns a testifying defendant who, on direct examination, volunteered instances of his older serious crimes and more recent lesser criminal activities to build – as the trial court found – an overall impression that he was presently no more than a minor criminal who had been merely an innocent bystander to the burglary and rape for which he was on trial. The question presented on appeal, therefore, is whether the government could properly impeach the credibility of that defense on cross-examination with the inconvenient truths of appellant's most recent and more serious criminal activity a week earlier, which he omitted from the account to the jury of his prior crimes.

Appellant emphatically answers "No," arguing that the October 6 burglary was "propensity evidence" introduced specifically to persuade the jury to infer his guilt of the October 13 burglary and rape a week later.[16] In response, the government justifies appellant's impeachment with the October 6 burglary for a

---

[15] See *supra* note 8 and accompanying text (indicating that the trial court rejected *Drew*'s "identity" and "intent" exceptions).

[16] *See Old Chief v. United States*, 519 U.S. 172, 181 (1997) (quoting *Michelson v. United States*, 335 U.S. 469, 475-76 (1948) (admission of prior crimes in evidence suggests criminal propensity likely to cause jury to "prejudge" defendant guilty)); *Thompson*, 546 A.2d at 417-20; *Campbell*, 450 A.2d at 430.

reason "entirely unrelated" to a "propensity to commit burglaries," namely, impeachment of the "misleading impression"[17] central to appellant's "innocent bystander"[18] defense: that his involvement in the crimes charged was limited to fencing related items for his cousin.

---

[17] *Kinard*, 635 A.2d at 1306 n.17; *see id.* (When admission of other crimes evidence will serve "substantial and legitimate purposes," such evidence may be used for "the limited purpose of impeachment" if the accused, claiming his "innocent presence" at the crime scene, seeks "to create a misleading impression [by denying he possessed a gun there] in anticipation of being shielded by the rule excluding other crimes evidence."); *Samuels v. United States*, 605 A.2d 596, 598-99 (D.C. 1992) (Permitting impeachment of a defense witness by cross-examination about her shared use of PCP with appellant, in order to avoid a "misleading impression . . . of their relationship" created by the defense presenting the witness as "a neutral and unbiased recounter of events" related to "the offense for which [appellant] was on trial."); *Wesley*, 547 A.2d at 1024-25 (After appellant admitted he was a drug dealer and testified that he had entered a building to stash drugs, the trial court permitted extensive cross-examination about his drug dealings "to discredit [his] testimony," that he acted in self-defense and fled with his drugs and money when individuals he found in his stash house attempted to rob him, "by showing that his drug sales that day were . . . so poor that he had decided to rob [those individuals] to supplement his income.").

[18] *Jones v. United States*, 548 A.2d 35, 39 (D.C. 1988); *accord*, *Kinard*, 635 A.2d at 1306 ("innocent presence"); *see also Flores*, 769 A.2d at 130, 132 (When defendant testified that he was running an errand in the area, merely approached his co-defendant to borrow a quarter, and had not seen a ChapStick container filled with cocaine, the trial court did not abuse its discretion in permitting cross-examination about appellant's prior drug use to challenge "his general credibility and the innocence of his presence in an area notorious for drugs."); *Jones*, 548 A.2d at 37, 39 (After defendant testified that he had seen a woman being arrested throw away a package of white powder and picked it up intending to find out if it was cocaine and "try it out of curiosity" before being arrested with that package in his sock at another location, "cross-examination about appellant's prior cocaine use" was "proper" because appellant's attempt "to portray himself as an innocent

(continued . . .)

Appellant concedes in his brief, as he must, that there are exceptions to the required exclusion of "other-crimes evidence" as long as admissibility of the evidence does not "depend 'wholly or primarily' on the jury inferring" that the defendant was "predisposed or had a propensity to commit the charged crimes."[19] As elaborated below, we agree with the government, concluding that the trial court did not abuse its discretion in determining that the probative value of the October 6 burglary – legitimately used to impeach appellant on a highly relevant, material issue – outweighed the prejudicial tendency of the subject matter of that impeachment to lead the jury toward an impermissible propensity inference.

### 2. Probative Value of October 6 Burglary to Rebut Innocent Bystander Defense

_____

(. . . continued)

bystander who had stumbled upon something illicit" put at issue "his sophistication with respect to drugs and his general credibility.").

[19] *Harrison v. United States*, 30 A.3d 169, 178 (D.C. 2011) (quoting *Johnson*, 683 A.2d at 1093); *see United States v. Gomez*, 763 F.3d 845, 856 (7th Cir. 2014) (en banc) ("The principle that emerges . . . is that the [trial] court should" ask "how the evidence is relevant without relying on the propensity inference.").

Appellant testified that he had been caught up unwittingly in his cousin's unknown activities inside D.B.'s building when Delonte emerged to give him stolen property for resale, as they had done on several earlier occasions. Appellant then enhanced this innocent bystander defense in two ways. First, on direct examination, he acknowledged earlier convictions for which he was on probation (robbery, two assaults, weapon possession, and failure to appear), thereby trying (as the trial court perceived it) to convince the jury that he was presently a relatively minor criminal, not one who would commit burglary, kidnapping, or rape. Second, appellant claimed on direct that he had feared having the stolen property the police found in his pants and backpack traced back to him, threatening his probation for his robbery and assault convictions. For that reason, he said, he had taken actions to change his appearance when leaving the alleyway behind D.B.'s building, used his gloves to wipe D.B.'s cellphone (thereby transferring her DNA onto his gloves), and fled from law enforcement officers when they were pursuing him on October 14. In other words, appellant gave relatively innocent explanations for much of the strongest evidence identifying him as the burglar who raped D.B. on October 13.[20]

---

[20] Technically, impeachment of appellant's innocent bystander testimony with the October 6 burglary relates most closely to the October 13 burglary, not also to the rape; but, the October 13 burglary is sufficiently intertwined with the rape that day to serve as evidence that appellant was the rapist as well as the

(continued . . .)

Our law has long recognized, and appellant fails to directly dispute, that when a defendant "attempt[s], on direct examination, to portray himself as an innocent bystander who [has] stumbled upon something illicit[,] the government can explore his sophistication with respect to [that illicit activity] and his general credibility,"[21] in order to correct any "misleading impression" created by that testimony.[22]

Critical here, therefore, is the fact that, on direct examination, appellant acknowledged only prior criminal activity that might convince the jury he was merely a minor criminal who would not commit the major crimes for which he was on trial. He deliberately failed to mention his most recent criminal charge: the far-from-minor October 6 burglary. This omitted, recent criminal activity undermines the credibility of both (1) his claimed present inclination to commit only less serious crimes consistent with his innocent explanations for the evidence against

_____

(. . . continued)

October 13 burglar. *See Johnson*, 683 A.2d at 1090, 1092, 1096-98. Indeed, physical evidence that appellant had from the October 13 burglary on his person (which he explained by claiming to be a fence), along with D.B.'s DNA on his glove (which he used his parole for earlier crimes to help explain), comprised compelling evidence that appellant was the October 13 burglar and rapist.

[21] *Jones*, 548 A.2d at 39.

[22] *Kinard*, 635 A.2d at 1306 n.17.

him, and (2) his probation rationale (derived solely from older crimes) for having

D.B.'s DNA on his gloves and his suspicious behaviors on October 13 and 14.

Appellant's omission of the October 6 burglary, therefore, was a relevant and

material basis for impeaching the intentionally "misleading impression" that he

created around that omission.[23]  In the trial court's words, he created an impression

that he "was just a fence who sells items stolen by Delonte and he only does small

crimes *now* like smoke weed and receive stolen property" (emphasis added).

Appellant's omission, we conclude, "open[ed] the door to further inquiry"[24]

on cross-examination into his relevant criminal activity on October 6.[25]  Given this

court's consistent case law,[26] we must say that he had "no right to set forth to the

jury all the facts which tend[ed] in his favor without laying himself open to a cross-

---

[23] *Id.* at 1305-06 n.17; *Samuels*, 605 A.2d at 599.

[24]  *Wesley*, 547 A.2d at 1025 (internal quotation marks omitted); *accord Samuels*, 605 A.2d at 598.

[25]  Appellant does not question that his charged but as yet untried crime was properly subject to analysis under the law governing "other crimes" evidence. *See Johnson*, 683 A.2d at 1093 ("[O]ur decisions have [] required the prosecution to establish, by clear and convincing evidence, that the other crime occurred and that the defendant committed it."); see also *supra* note 2.

[26]  See *supra* notes 17 and 18.

examination upon those facts"[27] – especially while expecting to be "shielded by the rule excluding other crimes evidence."[28]

In suggesting otherwise, appellant misconstrues the record. Principally, he adopts an unreasonably narrow understanding of the proceedings to argue that he did not make "any claim" that was "directly refute[d]" by the October 6 burglary or "imply that he was 'just a fence'" who "had never personally taken property from another" or had "committed only 'petty offenses.'" The record fully supports the trial court's finding to the contrary, that appellant's direct testimony was "carefully crafted" to leave the misleading impression that he was just a fence (taking "precautions," as he later described them, to protect his probation) throughout the relevant time period – July 29 to October 14, 2015.[29]

---

[27] *Fitzpatrick v. United States*, 178 U.S. 304, 315 (1900); *see Flores*, 769 A.2d at 131.

[28] *Kinard*, 635 A.2d at 1306 n.17; *cf. Portuondo v. Agard*, 529 U.S. 61, 73 (2000) ("A witness's ability to hear prior testimony and to tailor his account accordingly, and the threat that ability presents to the integrity of the trial, are no different when it is the defendant doing the listening."); *Walder v. United States*, 347 U.S. 62, 65 (1954) ("[T]here is hardly justification for letting the defendant affirmatively resort to perjurious testimony in reliance on the Government's disability to challenge his credibility.").

[29] Given a factual finding based on the trial court's first-hand observations of the proceedings, this court defers to the trial court's rational understanding of appellant's transcribed testimony. *See, e.g.*, D.C. Code § 17-305(a) (2012 Repl.) (proscribing this court's rejection of the trial court's factual findings "unless it

(continued . . .)

Nor can we accept appellant's underlying assumption that the trial court's statements during the full-day hearing, while court and counsel were verbally wrestling with the October 6 impeachment question, demonstrate that the trial court eventually relied exclusively on propensity reasoning to permit appellant's impeachment. Until the trial court made a final ruling that the government was "entitled to challenge [the] inference[s]" of appellant's "carefully crafted testimony" by using the October 6 burglary "to undermine the veracity of what [appellant was] saying" about the evidence against him for the October 13 crimes, all prior statements were tentative, exploratory.[30] Relatedly, the trial court's

_____

(. . . continued)
appears that the judgment is plainly wrong or without evidence to support it"); *Walker v. United States*, 167 A.3d 1191, 1209 (D.C. 2017) (recognizing the same); *Johnson v. United States*, 398 A.2d 354, 364-65 (D.C. 1979) (describing the need for a factual basis to support discretionary decisions). Notably, appellant's cryptic admission on cross-examination that he had not received the items in his backpack from the October 6 burglary "from other people" (testimony indicating that on occasion he was a thief, not just a fence) occurred *after* his testimony on direct examination that convinced the court he was presenting himself as "just a fence." *See Old Chief*, 519 U.S. at 182 n.6 ("It is important that a reviewing court evaluate the trial court's decision from its perspective when it had to rule and not indulge in review by hindsight.").

[30] The dissent relies heavily, *post* at 57-61, on quotations from the full-day hearing before the trial court's final review of "all of the cases" – a hearing *and legal research* that led to the court's ultimate opinion that evidence from the October 6 burglary was admissible for express, legitimate purposes, not wholly or even primarily as evidence of propensity to commit the crime on trial. See *supra* notes 9, 17-19 and accompanying text.

contemporaneous recognition of the inherent risk that the October 6 burglary might also be used to draw an impermissible propensity inference about appellant's guilt does not, on this record, undermine the ultimate discretionary determination that the October 6 burglary could be used to impeach the general credibility of appellant's relatively innocent explanations of the evidence.[31]

Nonetheless, without directly addressing the controlling case law supporting the trial court's rationale, appellant argues that whatever rationale might justify his impeachment with the October 6 burglary, no "other crimes" evidence is admissible unless "supported by some propensity-free chain of reasoning,"[32] which, he claims, is not satisfied here. The evidence, he says, must be justified by "how it fits into a chain of inferences . . . that connects the evidence to a proper purpose, no link of which is forbidden propensity evidence."[33]

We see no conflict between the legal principles that appellant pulls from federal circuit decisions and our own case law stating that other crimes evidence is

---

[31] *See Drew*, 331 F.2d at 89-90 ("When the evidence is relevant and important" to a proper purpose, "it is generally conceded that the prejudicial effect may be outweighed by the probative value."); *supra* notes 17 & 18.

[32] *United States v. Gomez*, 763 F.3d 845, 856 (7th Cir. 2014) (en banc).

[33] *United States v. Davis*, 726 F.3d 434, 442 (3d Cir. 2013).

precluded when its relevance "depend[s] *wholly or primarily* on the jury inferring" that the defendant was "predisposed or had a propensity to commit the charged crimes."[34] No case on which appellant substantially relies announces a rule that would preclude impeachment with the October 6 burglary.[35] In *Gomez*, for example, a small amount of cocaine found in the bedroom of a charged conspirator could not properly be used to refute a mistaken identity defense, without relying on a propensity inference, because that cocaine had no discernible connection with the cocaine separately seized from the distribution conspiracy;[36] and, in *Davis*, the accused's prior conviction for possession of cocaine was irrelevant because it had no link, other than a propensity inference, to the more serious charge for possession with intention to distribute then on trial.[37] Contrary to the impeachment here, these cases on which appellant principally relies found the taint of propensity

---

[34] *Harrison,* 30 A.3d at 178 (emphasis added); *cf., e.g.*, *Gomez*, 763 F.3d at 856 (stating that the "propensity-free chain of reasoning" does not mean that "other-act evidence must be excluded whenever a propensity inference can be drawn; rather," evidence is excluded "if its relevance to 'another purpose' is established *only* through the forbidden propensity inference").

[35] *See, e.g.*, *United States v. Hall*, 858 F.3d 254, 262, 268 (4th Cir. 2017) (rejecting prior drug possession as an affirmative basis for proving knowledge or intent to distribute); *United States v. Commanche*, 577 F.3d 1261, 1264, 1268 (10th Cir. 2009) (rejecting admission of the details of prior battery convictions as irrelevant to refuting an undisputed claim of self-defense); see also *infra* note 41.

[36] 763 F.3d at 852, 861-63.

[37] 726 F.3d at 438, 442-45.

because the other crimes at issue did not link up with the legitimate purposes for which they were proffered.

In the present case, however, "even though it revealed appellant's prior bad act[],"[38] the October 6 burglary was not admitted as evidence intended to permit an inference that appellant had "committed the crime charged"[39] because he had committed a burglary a week earlier. That is to say, the link between the prior crime (October 6) and the crime charged (October 13) was *not* "wholly or primarily"[40] appellant's propensity to commit the latter simply because he previously committed the former. To the contrary, the chain of reasoning that links the October 6 burglary to the October 13 crime was, as a legal matter, sufficiently free of the propensity danger. Because appellant had materially misrepresented his complete criminal history – creating the impression that he most recently committed only lesser crimes such as fencing stolen items – the October 6 evidence was appropriate for impeachment of that misleading testimony; appellant's injection of his lesser crimes into the case on direct examination, in aid

---

[38] *Samuels*, 605 A.2d at 598 (internal quotation marks omitted).

[39] *Drew*, 331 F.2d at 89; *see Kinard*, 635 A.2d at 1305-06 n.17.

[40] *Harrison*, 30 A.3d at 178.

of explaining his story of what happened on October 13, justified the government's impeachment with a recent, more serious crime.

In sum, the government used a relevant prior bad act to impeach appellant's broad claim that, given his criminal history, he would not commit crimes as serious as those on trial. As the trial court found, appellant made this claim implicitly by (1) giving a candid and detailed admission to receiving and selling stolen property with his cousin on multiple prior occasions, (2) emphasizing that his more serious criminal convictions were in his past, and (3) explaining that his inculpatory actions on October 13 were taken out of fear for his related parole. This impeachment was fundamentally different from using the prior bad act "wholly or primarily" as direct proof that appellant was guilty of the offense at trial.[41] The impeachment, rather, was directly "linked" to what the defense had started; it was a direct rebuttal of appellant's sophisticated invitation for the jury to credit his relatively innocent explanations for the government's evidence against him by

---

[41] *Id.*; *cf. United States v. James*, 555 F.2d 992, 997 (D.C. Cir. 1977) ("A defendant may not . . . make [] sweeping claims going beyond a mere denial of complicity in the crimes of which he was charged, without running the risk that bad acts testimony or even illegally-obtained evidence will be introduced in rebuttal." (footnotes and internal quotation marks omitted)); *United States v. Washington*, 463 F.2d 904, 906 (D.C. Cir. 1972) ("While we agree that evidence of other crimes is not admissible as direct evidence of guilt, the question is different when the accused has specifically testified on direct . . . in which case the prosecutor may at least to some extent attempt to impeach that denial.").

drawing a false inference from the materially incomplete narrative he gave of his criminal history: that he was not guilty because he was presently a different type of criminal.

The trial court thus properly concluded that the October 6 burglary was "legitimate impeachment" because it "tend[ed] to undermine the veracity of what [appellant was] saying" about the evidence against him, even though the October 6 burglary "might also be" separately misused to infer his guilt for the October 13 burglary and rape.[42]   As we have explained, for purposes of impeaching and rebutting a testifying defendant's presentation of an innocent bystander defense, it is fair game for the government to use relevant other crimes evidence for the independent purpose of probing testimony bolstering a defendant's general declaration of innocence.   And, on this record, we "have no difficulty concluding that the trial court [] reasonably [] concluded that the [October 6 crime] was not offered to prove [appellant's] predisposition to commit the" October 13 burglary and rape.[43]

---

[42]   The trial court thus explained how the October 6 evidence was "relevant to a non-propensity purpose . . . without relying on a propensity inference." *Gomez,* 763 F.3d at 856; see *supra* note 20.

[43]   *Johnson*, 683 A.2d at 1093; *see id.* at 1090 ("We continue to recognize that the inadmissibility of other crimes may be overcome if it is offered on and determined to be relevant to a material issue in the case."); see *supra* notes 20 &

(continued . . .)

### 3.  Probative Value v. Unfair Prejudice of October 6 Burglary

The question remains: whether other crimes evidence (the October 6 burglary), otherwise properly before the jury by way of a propensity-free chain of reasoning (impeachment of misleading other crimes testimony supporting an

_____

(. . . continued)

31.  Fundamentally, the dissent argues for reversal by claiming that evidence from October 6 unlawfully demonstrated appellant's criminal propensity.  To the contrary, only after appellant had testified – presenting himself as currently no more than a relatively minor criminal – did the government seek admission of October 6 evidence.  Thus, defense strategy on direct (and not the government's pretrial agreement to severance or notices of appellant's prior bad acts) led to the trial court's determination that appellant's testimony had opened the door to his impeachment with the previously joined October 6 charge.  Cf. *post* at 54. Furthermore, the trial court never "permit[ted] the government . . . to argue that [appellant] must be guilty because he is the kind of person who burgles homes," *post* at 69, nor did the government ever make that argument.  Thus, the dissent ignores this court's case law stating that other crimes evidence is precluded only when its relevance "depend[s] *wholly or primarily* on the jury inferring" that the defendant was "predisposed or had a propensity to commit the charged crimes." *Harrison,* 30 A.3d at 178 (emphasis added); *see Gomez,* 763 F.3d at 856, *supra* note 34.  That is not the case here; the trial court admitted the October 6 evidence "wholly or primarily" to impeach appellant's misleading testimony. In premising the dissent's legal analysis entirely on the contention that impeachment with the October 6 burglary should have been excluded as "propensity evidence," e.g., *post* at 66, 68, our colleague does not effectively distinguish our body of case law holding that a prior crime, tending to show a propensity to commit another crime, can nonetheless be admitted for a legitimate purpose – more probative than prejudicial – such as contradicting a defendant's misleading testimony supporting his innocent bystander defense. Compare *post* at 68-70 with *supra* footnotes 17-19 and accompanying text.

innocent bystander defense), was admitted through an abuse of trial court discretion because any "probative value" was "substantially outweighed by the danger of unfair prejudice" to appellant's defense.[44] We perceive no such abuse.

## a. Probative Value

Appellant's arguments that the probative value of the October 6 burglary "was minimal" because it was "unnecessary" in light of his admissions to an earlier robbery conviction, and of his obvious desire not to lose his probation, are unpersuasive. Again, he misconstrues on appeal the nature of his defense at trial and the trial court's ruling. During direct examination, appellant did much more than merely "pull the sting" from his prior convictions. Because he so effectively positioned his earlier convictions as ancient history to support his innocent account of the evidence against him, those crimes could not have effectively impeached his account of criminal activities from the time he got out of prison for those 2013 convictions through his apprehension on October 14, 2015. Having watched and heard every word of appellant's direct examination, the trial court was well-positioned to find that the October 6 burglary countered the strong impression

---

[44] *Johnson*, 683 A.2d at 1099 (internal quotation marks omitted).

appellant conveyed: that "he only does small crimes *now* like smoke weed and receive stolen property" that he then sold for Delonte (emphasis added).[45]

## b. Unfair Prejudice

We address, next, appellant's claim that, whatever its probative value, impeachment with October 6 evidence was "extremely prejudicial." The "strikingly similar facts" of the two burglaries, he says, necessarily led to an "irresistible" and harmful propensity inference. In our view, appellant again asks for more than either the record or the law allows.

After following the trial court's instruction to lodge individual objections when the prosecution was introducing the physical evidence of the October 6 burglary, appellant made no further objection when the prosecution referred to the

---

[45] The probative/prejudicial analysis necessarily takes place based on proffers and evidence once "all pertinent factors [are] available." *Thompson*, 546 A.2d at 421. In this case, as to appellant's intention to limit his testimony to the prior crimes he volunteered on direct examination, this analysis by the court was appropriate at the conclusion of defendant's direct testimony. Furthermore, impeaching the impression that appellant was presently no more than a fence receiving stolen property justifies the admission of the October 6 burglary regardless of the legality of appellant's (analytically irrelevant) use of marijuana on October 13. See *post* at 51-52.

underlying details of that crime.[46] Rather, counsel made a tactical choice to forego

further objection and develop on redirect examination as many details of the

October 6 burglary as possible, in order to forcefully argue that appellant did not

commit the October 13 rape because he did not rape the woman he found asleep in

her bed on October 6. Because appellant fully embraced the irrelevant details of

the October 6 burglary for his own advantage at trial – including the sensational

detail that he had entered the bedroom of a sleeping woman – we have no reason to

consider whether disclosure of these details to the jury was overly prejudicial to

appellant.[47]

---

[46] Appellant has not raised on appeal any opposition to the government's reliance on physical evidence from the October 6 burglary found in his backpack when he was arrested.

[47] *See, e.g.*, *Allen v. United States*, 495 A.2d 1145, 1152 (D.C. 1985) (en banc) (recognizing that "errors not raised at trial will not be disturbed on appeal if, for example, evidence of guilt is overwhelming, or counsel's failure to object can be viewed as a tactical choice" (internal citations omitted)); *Bruce v. United States*, 617 A.2d 986, 993 (D.C. 1992) ("[W]e are satisfied that the judge did not commit plain error by failing to intervene on her own initiative and by allowing the attorneys, in effect, to 'try their own case.'"); *Poteat v. United States*, 330 A.2d 229, 231 (D.C. 1974) (acknowledging "the rule . . . that a party may deliberately decide for tactical reasons to bypass an available objection" and make that choice "binding"). Although the dissent's understanding of the trial court's approach to the details of the October 6 burglary finds some basis in the background that the trial court presented before its ruling, *post* at 64-65 note 11, the dissent fails to recognize that appellant's specific objections to impeachment before and after that ruling were all aimed at limiting the use of the "extrinsic" or physical evidence

(continued . . .)

Finally, we have long endorsed instructions requiring the jury to consider prior convictions *only* for impeachment of a "defendant's credibility," not for assessment of "guilt or innocence of the charged offense."[48]   And, we have observed that such instructions, "if not easily followed," are "at least readily understood" and thus on balance help reduce, if not entirely dissipate, the danger of unfair prejudice.[49]

Here, the trial court gave the jury easily understood instructions that the October 6 burglary could be used only to judge the credibility of appellant's

_____

(. . . continued)
from the October 6 burglary found in his backpack alongside the physical evidence of the October 13 burglary – evidence not questioned on appeal. See *supra* note 46.

   We think that the trial court's determination that "the overall burglary substantially outweighs the prejudicial effect," coupled with the determination that it had discretion "to admit substantive evidence of this other burglary and . . . would withhold ruling on that until I hear how the testimony goes" -- then followed by its immediate invitation for "either party [to ask for] any additional findings of fact or conclusions of law" – was broad enough to invite defense counsel to raise a first objection to the specific details about the October 6 burglary if that had been counsel's purpose. *See generally Mercer v. United States*, 724 A.2d 1176, 1191-93 (D.C. 1999) (discussing the careful calculus that courts and counsel must perform once a door is opened to otherwise inadmissible evidence).

   [48]  *Thompson*, 546 A.2d at 426.

   [49]  *Id.*

testimony and not when the jury was determining his guilt of the crimes on trial.[50]

If not a complete erasure of the jury's natural predilection to draw propensity inferences when presented with other crimes, those instructions are a helpful and sufficient deterrence to that misuse of the other crime made legitimately probative by appellant's testimony.[51]

* * *

In sum, we perceive no abuse of discretion in the trial court's ruling "that the probative value of the overall [October 6] burglary" to impeaching appellant's innocent bystander defense "substantially outweigh[ed] the prejudicial effect" of that other crime coming before the jury. Given the strength of the government's evidence and the clarity of the trial court's instructions to the jury, "[w]e think it unlikely that a reasonable jury would have inferred a criminal disposition to commit" the October 13 burglary and rape[52] "wholly or primarily"[53] on the basis of the fact that appellant committed another burglary without rape on October 6.[54]

---

[50] See *supra* note 10.

[51] See, e.g., *supra* notes 24 to 28 and accompanying text.

[52] *Hughes v. United States*, 150 A.3d 289, 303 (D.C. 2016). Moreover, contrary to the dissent, allowing in evidence of the October 6 burglary after the unopposed pretrial severance of the two burglaries was not an abuse of discretion

(continued . . .)

_____

(. . . continued)

"under the particular circumstances of this case" following appellant's testimony. *Samuels*, 605 A.2d at 598; see *supra* notes 24-28 and accompanying text. Indeed, "the record reveals that the trial judge gave appropriate [consideration] to the severance [] and carefully weighed the probative value of the evidence against its prejudicial effect in view of defense counsel's direct examination." *Samuels*, 605 A.2d at 599.

[53] *Harrison*, 30 A.3d at 178.

[54] The dissent erroneously states that the trial court expressly permitted appellant's impeachment with "a propensity chain of reasoning" or a "forbidden propensity inference." *Post* at 56, 68, 73. That is incorrect; the trial court did not conclude that the October 6 burglary was admissible "to prove [appellant's] disposition to commit the crime charged." *Johnson*, 683 A.2d at 1090; see *supra* at 28-30 & note 43; cf. *post* 69. As we have explained, the evidence from the October 6 burglary was properly admitted because it was relevant for a legally distinct and permissible purpose: to show that appellant's testimony misrepresented his recent criminal history, and thus to permit the jury to use that misrepresentation to assess his credibility when countering the independent evidence that he committed the October 13 crimes. See *supra* at 16-24.

The record shows that the trial court got it right. After lengthy discussions covering several theories of admissibility, the trial court ultimately ruled that the October 6 evidence was admissible "under [an] impeachment theory" for the transcendent reason that it was relevant to "refut[ing] the implication that [appellant] was just a fence" who "only does small crimes." The court then reinforced that ruling by expressly limiting both the government and the jury to using the October 6 evidence only for assessing appellant's credibility. The many references to "propensity" or "propensity evidence" quoted by the dissent, *post* at 57-61, are best read, in context, not as established grounds for the court's ruling but, rather, as queries about the potential admissibility of other crimes evidence when the forbidden propensity inference is, and is not, controlling. See *supra* at 25, 28-30. Contrary to the case law test on which the dissent relies, the October 6 evidence was not excludable on the ground that its relevance was "established *only* through the forbidden propensity inference." *Post* at 68 & note 12. The evidence was admissible, correctly, because of its predominant relevance to impeaching appellant's credibility by directly contradicting the story he told to bolster his explanations for the government's evidence against him. See *supra* at 28-30.

## II.  Juror Excusal

We "review a trial court's decision to replace a juror with an alternate for abuse of discretion,"[55] affirming where the trial court provides us with a factually supported and legally sufficient reason for exercising that discretion.[56]   In that exercise, the trial court must ensure that deliberating jurors are not removed "for dissenting from the majority view,"[57] but in doing so the court must avoid "inquiry into the juror's views on the merits of the case."[58]

### A.  Jury Notes and the Trial Court's Inquiry

During the course of appellant's trial, Juror 5 sent several notes to the trial court.  In her first note, Juror 5 indicated that two other jurors had been asleep. The second note said that she was "not feeling well" but "would like to continue," which she did after speaking with the court.  On May 31, 2016, the case was submitted to the jury for deliberations to begin the following day.

---

[55]  *Israel v. United States*, 109 A.3d 594, 612 (D.C. 2014).

[56]  *See Hinton v. United States*, 979 A.2d 663, 683-84 (D.C. 2009) (en banc).

[57]  *Israel*, 109 A.3d at 612 (quoting *Hinton*, 979 A.2d at 682).

[58]  *Shotikare v. United States*, 779 A.2d 335, 344 (D.C. 2001).

Early in the afternoon of June 1, 2016, a note from the jury informed the trial court that "[t]he jury has one juror that is disputing that a rape occurred. Our ability to assess the facts of the case may be impeded by this. The jury requests . . . the official stipulations." The court was "quite puzzled by the note" because "the parties [had] stated all along that there was no dispute that a rape occurred." The defense agreed that it had not pursued a no-rape theory, but posited that perhaps the jury was confused because it had not yet received all the exhibits from the rape examination, and was indicating that it wanted to wait before stipulating that a rape had occurred, especially because the jury had not "been deliberating for very long." At the request of the defense, the court responded to the note by instructing the jury that it had "all of the stipulations that have been entered into evidence" and to send another note if that response did "not address [their] concerns."

The following morning, June 2, 2016, Juror 5 asked, "May I be excused from this [deliberation] totally[,] I'm not well at all." The court observed that this was the juror who had previously been sick "and gritted it out." Juror 5 came before the court and asked to be "[t]otally . . . excused" due to stomach and head pain. The court asked: "Is there anything that we can do to accommodate you so that you can deliberate or not?" Juror 5 responded: "No, but thank you so much

for asking me." Juror 5 retired to the jury room with the court "not[ing] for the record that she didn't look" or "sound well." The court indicated an inclination to find "that [Juror 5 was] unable to deliberate . . . given her state and her demeanor and what she said."

Defense counsel expressed concern that Juror 5 was "requesting to be removed because of pressure in deliberations as opposed to her physical well being." The court found this request speculative and asked defense counsel to identify a basis for it. Recognizing that the court did not know which juror disputed whether a rape had occurred, defense counsel noted that Juror 5 appeared to be agreeing with the defense during closing arguments. The court again stated that this concern was "speculative," added that Juror 5 "doesn't look well physically," and noted that it would be "really dangerous to start making inquiries into the state of deliberations." Defense counsel pressed the court to ask if there was any other reason for Juror 5's request, because it was not apparent why she had tears in her eyes. The court replied that the tears in Juror 5's eyes appeared "to be part of her illness"; she had "been vocal throughout the trial" and was "perfectly ca[pa]ble of telling" the court if something other than illness caused her request; and that "[t]his [was] a jury that [got] along from what [the court had] seen." The court thus found "no basis for believing" that Juror 5's request to be excused was

"pretext for her feeling that she's being ganged up on." Defense counsel did not object either to the court's determination that Juror 5 was "unable to continue deliberating based on her own representations that she's not feeling well" or to the ultimate decision to "excuse her."

The jury was reconstituted with an alternate and instructed to begin deliberations anew. After a brief period of deliberation, the reconstituted jury reached another impasse and received instructions to continue deliberating. Thereafter, appellant was found guilty on all counts.

## B. Discussion

When the trial court has reason to believe that a deliberating juror is requesting release because of undue pressure to change her views, the court must be sure that the juror is asking to be released for a proper reason.[59] Faced with

---

[59] *See Samad v. United States*, 812 A.2d 226, 230 (D.C. 2002) ("If the court notices, or is reliably informed, [of juror misconduct], the court has a responsibility to inquire and to take further action if necessary to rectify the situation." (internal brackets, ellipsis, and quotation marks omitted)); *Shotikare*, 779 A.2d at 344 ("To remove a juror because he is unpersuaded by the [g]overnment's case is to deny the defendant his right to a unanimous verdict." (internal brackets and quotation marks omitted)); *United States v. Ginyard*, 444 F.3d 648, 654 (D.C. Cir. 2006) ("[U]pon having reason to believe the juror is a holdout, [the court] has an

(continued . . .)

these jury notes, the trial court did not abuse its discretion by, first, inquiring into Juror 5's stated reason for requesting release; then determining that the available facts did not provide a basis for exploring the state of the jury's deliberations; and, finally, replacing Juror 5 because of her observable illness. In other words, the court's "careful and fair inquiry" focused on the necessary issues without unnecessarily "intrud[ing] on the jury's substantive deliberations or learn[ing] about any juror's views of the evidence."[60]

The court made sure that it had a firm factual foundation before ruling on Juror 5's request for release by interviewing her, inquiring about her condition, and asking whether the court could make accommodations that would allow her to continue her service. Despite limited questioning by the court, Juror 5's clear responses and the court's direct observations that the juror did not look or sound

_____

(. . . continued)
enhanced duty to determine the precise circumstances of the juror's availability lest the action of the court interfere with a defendant's Sixth Amendment right to a unanimous verdict.").

[60] *Shotikare*, 779 A.2d at 340; *see id.* ("The judge properly excused the juror for [mis]conduct, and not because of her views or to break a deadlock.").

well convince us that the court developed an appropriate basis for determining that Juror 5's request to be released was in fact due to her observed illness.[61]

The jury note requesting release offered no other basis for suspecting anything was amiss, for it indicated only that an unidentified juror questioned whether a rape had occurred, came during the early stages of deliberation, made no mention of misconduct, and the reconstituted jury continued to have differences before reaching their verdict.[62] There is no indication that the first note reflected anything more than early discussion about a fact of the case that appellant did not appear to contest and was thoroughly established by D.B.'s testimony, D.B.'s subsequent communications, and her medical treatment.[63] Nor did any fact come

---

[61] *See Bean v. United States*, 17 A.3d 635, 638-39 (D.C. 2011) ("We have declared on many occasions that any factual findings anchored in credibility assessments derived from personal observations of the witnesses is beyond appellate reversal unless those factual findings are clearly erroneous."); *see also Israel*, 109 A.3d at 615 ("Rule 24 (c) imposes no explicit 'exhaustion of alternative remedies' requirement, and we are satisfied that other circumstances can provide the necessary factual foundation for a finding that a juror is unable to carry out her oath.").

[62] *See Israel*, 109 A.3d at 614 ("We deem it important" that the issue with the juror "came to light early after the case had gone to the jury" and note that "following the replacement . . . deliberations continued for three days before the jury reached its verdict, suggesting that there remained much room for discussion at the time" of the removal.).

[63] *Cf. Hinton*, 979 A.2d at 691-92 ("[I]f the government's case is strong and there is no reason apparent in the record to think the erroneously removed juror

(continued . . .)

to light during Juror 5's interview to compel the court to breach the "presumptive secrecy" of jury deliberations that protect appellant's right to a unanimous verdict without judicial interference.[64]

The trial court, therefore, did not err in determining that defense counsel's observations that Juror 5 had tears in her eyes, and that she appeared to be agreeing with the defense during closing argument, offered nothing more than speculation about undue influence.[65] This conclusion was reinforced by the court's observation that Juror 5 had previously informed the court about other jurors' conduct. Seeing no "reasonable possibility" in this record "that the impetus for" Juror 5's request to be replaced "stem[med] from [her] views on the merits of the

_____

(. . . continued)
would have dissented, a reviewing court could be satisfied that the juror substitution had no substantial influence on the outcome.").

[64] *Shotikare*, 779 A.2d at 344; *see Hinton*, 979 A.2d at 688-89 ("Once they start hearing and considering the evidence, individual jurors may evaluate it differently, and they may no longer be viewed as fungible . . . ."); *Israel*, 109 A.3d at 613 ("Necessarily, to avoid intruding into the jury's deliberations, 'the record that [was] generated in the course of the [court's] inquiry [was] less than exhaustive." (quoting *Shotikare*, 779 A.2d at 345)).

[65] *See Shotikare*, 779 A.2d at 342 ("[T]here was no evidence that [the juror] was in any minority, her views were unknown, and the reason she was being excused had nothing to do with the merits or the inability of the jury to reach a verdict."); *id.* at 345 ("The jurors' views of the case, the back and forth among them concerning the evidence or the application of the law to the facts . . . are off limits.").

case,"[66] we conclude that the trial court did not abuse its discretion by rejecting

defense counsel's unsubstantiated request to peek into the state of the jury's

deliberations.[67]

We have no difficulty concluding that illness may render a juror "unable to

perform" her sworn "duties."[68] Minor illness or discomfort, of course, will not

---

[66] *Id.* at 345-46; *accord Israel*, 109 A.3d at 614 ("Nor can we agree on this record that there is a reasonable possibility that [the juror] was removed because she was a dissenting voice or because of her views on the evidence such that her removal violated appellant's Fifth and Sixth Amendment rights.").

[67] *See Samad*, 812 A.2d at 230 ("The court's own contemporaneous observations of the juror may negate the need to investigate further . . . . Unsubstantiated or unreliable allegations of juror misconduct . . . need not trigger an evidentiary hearing . . . ." (internal citation omitted)); c*f. Hunter*, 606 A.2d at 144 ("The purpose of requiring a specific objection is to enable the prosecution to respond to any contentions raised and make it possible for the trial judge to correct the situation without jettisoning the trial.").

[68] D.C. SUPER. CT. CRIM. R. 24 (c); *see Hinton*, 979 A.2d at 684 ("Although the trial judge did not advert explicitly to the criteria of Rule 24 (c), the record satisfies us that the judge sought to apply the correct legal standard" by "scrutinizing whether [the juror] had the capacity to continue to serve as a juror."); *Ginyard*, 444 F.3d at 652 (D.C. Cir. 2006) ("Were a holdout juror to request dismissal because he was experiencing a heart attack, [case law] would not prevent a district court from excusing that juror under Rule 23(b) for good cause, even if the record suggested that juror independently had doubts about the sufficiency of the evidence."); *United States v. Puche*, 350 F.3d 1137, 1152 (11th Cir. 2003) ("[T]he juror was too ill to continue. This is not legally irrelevant, nor does it appear to be without any factual support."); *United States v. Fajardo*, 787 F.2d 1523, 1526 (11th Cir. 1986) ("Although here the evidence of juror incapacity was not overwhelming, it was sufficient to support the court's conclusion that the juror was incapacitated and unable to continue.").

necessarily be sufficient for the court to remove a juror, but the record before us shows that Juror 5 had previously experienced illness and yet sought to press on. Therefore, absent any evidence that the juror was attempting to avoid her civic duty, we defer to the court's "superior ability to observe the demeanor of the juror and her familiarity with the proceedings"; we do not "second-guess [the court's] reasonable judgment" that Juror 5 had become physically unable to continue her service and should be released from further service.[69]

* * *

For the foregoing reasons, we conclude that the trial court did not abuse its discretion in allowing the challenged impeachment with other crimes evidence or in excusing the noticeably ill juror. Appellant's convictions are therefore affirmed.

*So ordered.*

---

[69] *Hinton*, 979 A.2d at 683-84 (internal brackets and quotation marks omitted).

EASTERLY, *Associate Judge*, dissenting:  A defendant who takes the stand and testifies that, although he has committed prior crimes, he is not guilty of the charged offense does not open the door to impeachment about his criminal character.  And that defendant's not-guilty narrative most certainly cannot be impeached with propensity evidence—that is, the government may not use a prior crime to argue that the defendant's exculpatory testimony about the charged offense must be false.  Both of the trial court's rulings to the contrary were wrong.  Because the Majority Opinion effectively endorses those rulings, I respectfully dissent.

Mr. Pitt did not open the door to any impeachment of his criminal character when he exercised his constitutional right to testify in his own defense.  Mr. Pitt admitted his guilt of serious crimes for which he had been *recently*, previously convicted, appropriately said nothing about a still-pending October 6, 2015, burglary charge that had been severed after the government conceded that it did not fall under an exception for the admission of prior bad acts under *Drew v. United States*,[1] and provided an alternate explanation for potentially inculpatory facts regarding the charged offense:  he was on surveillance video near the scene of the crime because his cousin had brought him there; although his cousin entered the

---

[1]  331 F.2d 85 (D.C. Cir. 1964).

victim's building, he had waited outside; and when his cousin exited some period of time later, he had received what he presumed was stolen property, which he wiped down with his gloves and then sought to sell for his cousin, as he had done on prior occasions. Thus the trial court's ruling that Mr. Pitt opened the door to impeachment as to his character by presenting a false image of himself as a minor criminal, "just a fence," is neither a "fully support[ed]" finding of fact, *see ante* at 24, nor a reasonable exercise of discretion. Lacking in legitimate foundation, factual or legal, it is erroneous as a matter of law.

And simply by virtue of taking the stand to testify that he was not guilty, Mr. Pitt categorically could not be "impeached" with a propensity inference as the trial court ruled. My colleagues in the Majority do not grapple with this ruling; instead they recast the question before us as whether the trial court properly ruled that the government has a right to cross-examine a testifying defendant about *non*propensity evidence. As a general proposition, that is undisputed. As the record clearly reflects and as detailed below, however, that was not the court's ruling. Instead, the trial court ultimately determined that the government was entitled to question Mr. Pitt about the October 6 burglary to show "he burgled this place because he burgled that place." In other words, the trial court ruled that the government could impeach Mr. Pitt's not-guilty narrative with a propensity

inference. Such impeachment is incompatible with bedrock principles of criminal justice that, no matter his prior bad acts, a defendant is presumed innocent of a charged offense and that any conviction must be supported by proof beyond a reasonable doubt that a defendant committed the charged crime. This ruling too is erroneous as a matter of law.

**I.      The Trial Court Incorrectly Ruled That Mr. Pitt Opened the Door to Impeachment of His Criminal Character by Presenting a False Image of Himself As "Just a Fence."**

After the government presented its case, Mr. Pitt took the stand and testified about his specific actions on October 13, 2015, the date of the charged offenses. He explained that he, then twenty-one, had been living with his aunt and his cousins, that earlier in the day his cousin Delonte dropped him off at his friend Justin's home where he hung out and smoked marijuana, and that he and Delonte met up later that day at Eastern High School to go see Mr. Pitt's brother. As they were walking to the Metro, Delonte diverted to the victim's building and said he wanted to visit a friend who lived there. Mr. Pitt opted to wait outside to smoke more marijuana. When his cousin emerged from the building about fifteen to twenty minutes later, he gave Mr. Pitt checks and a cellphone to sell. Mr. Pitt explained he did not ask Delonte where these items came from but he suspected they were stolen because he had sold stolen property for Delonte before. At this

point, Mr. Pitt denied ever entering the victim's apartment and denied raping, choking, or beating her.

Mr. Pitt testified that he then parted ways with his cousin. As he left the alley, he put on his jacket. He testified he was worried about being seen because Delonte was "acting weird," because he was carrying the phone and checks that were likely stolen, and because he was still on probation after a 2013 guilty plea to robbery and assault on a police officer. Mr. Pitt then also admitted that he had other prior convictions, including convictions from D.C. from 2013 for possessing a prohibited weapon and for violating the Bail Reform Act, and convictions from Georgia two years before that (when he was seventeen) for battery and aggravated assault.

Lastly, Mr. Pitt detailed his whereabouts until the time of his arrest that evening. He first tried unsuccessfully to meet up with his brother and used the stolen cell phone to call him; he then wiped his prints off the phone with his gloves and tried to sell the phone at Gallery Place. He ultimately headed home. While at a gas station buying snacks, he was approached by the police, tried to flee, and was apprehended. Mr. Pitt concluded his testimony on direct by again denying that he had entered the victim's apartment and raped her.

It was this testimony that the government asserted "completely opened the door" to the previously severed October 6 burglary charge based on the "*suggestion* that the Defendant has acted as the middle man in these types of transactions." The court was initially, rightly skeptical, asking why that would be so given that "the only thing that's changed now is he's now testified and he has made statements that suggest that he was innocently standing outside while a burglary took place; while a phone was taken." But the trial court ultimately, incorrectly ruled the October 6 burglary impeached Mr. Pitt's "testimony to the extent it refutes the implication that the defendant was just a fence who sells items stolen by Delonte and he only does small crimes now like smoke weed and receive stolen property." Mr. Pitt's testimony does not support such an implication. Moreover, no deference is due to the trial court's recharacterization of Mr. Pitt's testimony[2] where the inferences the trial court drew are not only factually unsupported but also contrary to law.

Mr. Pitt's testimony about smoking marijuana—a noncriminal activity[3]—was an integral part of his narrative of his actions on the date of the charged

---

[2] *See* D.C. Code § 17-305(a) (2012 Repl.) (providing that this court should not set aside factual findings unless "plainly wrong").

[3] Since the Legalization of Minimal Amounts of Marijuana for Personal Use Initiative of 2014, D.C. Law 20-153 (2014) went into effect on February 26, 2015,

(continued . . .)

offense. Hanging out with Justin and smoking marijuana filled the gap between leaving the house with Delonte in the morning and reconnecting with him in the afternoon. And smoking more marijuana in the alley provided the explanation for his decision not to accompany Delonte inside the victim's apartment building. It both misconstrues this testimony and gives it incorrect legal import to say it supported a false narrative that Mr. Pitt "only does small crimes *now* like smoke weed." *Ante* at 23, 33.

Further, Mr. Pitt never said, much less implied, that he was, by nature, "just a fence," which themselves are words he never used. He testified that he had previously acted in that capacity to explain why he thought the phone and checks that Delonte gave him were stolen, even though he had not asked Delonte how he had come into possession of these items. He further testified that he attempted to sell the presumably stolen phone on the date of the offense—that was his defense to the more serious charges of burglary and rape. Needless to say, it is commonplace for defendants to take the stand to admit to lesser criminal conduct but deny greater criminal liability. Such a defense does not support an inference

_____

(. . . continued)

it has been legal for an individual over the age of twenty-one (as Mr. Pitt was in October 2015) to "possess, use, purchase or transport" up to two ounces of marijuana. *See* D.C. Code § 48-904.01(a)(1)(A) (2015 Supp.).

that the defendant is making a broader statement about his criminal character. The majority opinion cites no case that says it does. *See ante* at 22–24 nn.21–28.

Likewise, Mr. Pitt never said or implied that he was *exclusively* a minor criminal or that he was inclined to commit *only* less serious crimes or that his criminal convictions were "ancient history," *ante* at 32. To the contrary, he admitted that *in the four years immediately preceding the charged offense,* from age seventeen to twenty-one, he had amassed a significant criminal history in two jurisdictions that included robbery, aggravated assault, and weapons possession. His counsel no doubt sought to draw the sting from these prior convictions by introducing them on direct—as she was entitled under our case law to do, *Woods v. United States*, 987 A.2d 451, 457 (D.C. 2010) (explaining "a party is entitled to bring out on direct examination damaging information about his witness" and collecting cases (internal quotation marks omitted))—but that did not create an inference that Mr. Pitt was merely a petty criminal. Rather the "judicial[ly] approv[ed]" inference from such testimony is that the jury would see that Mr. Pitt was willing to admit to the crimes he had actually committed.[4] *Kitt v. United*

---

[4] If the government had any concern that an alternate inference could be drawn, it could have asked the court to clarify this for the jury via an instruction. *See Kitt*, 379 A.2d at 975 (holding that "the trial court should have afforded defense counsel the same privilege traditionally accorded the government to bring

(continued . . .)

*States*, 379 A.2d 973, 975 & n.2 (D.C. 1977) (explaining that the point of eliciting of a witness's prior convictions on direct examination is to enhance the witness's credibility); *accord Reed v. United States*, 452 A.2d 1173, 1179 (D.C. 1982).

My colleagues in the Majority suggest that the trial court had one other basis for concluding that Mr. Pitt misrepresented his criminal character: his failure on direct examination to volunteer his guilt of the October 6 burglary. *See ante* at 22 (justifying the trial court's ruling because Mr. Pitt "deliberately failed to mention his most recent charge"); *see also id*. at 18, 20–22, 28, 30–32, 37 n.54. But this too is incorrect, factually and legally. At no time, either in its lengthy colloquy with counsel or in its ruling, did the trial court ever fault Mr. Pitt for not admitting in his testimony on direct his guilt of the as-yet-untried October 6 burglary, and for good reason. As noted above, the government had already conceded before trial that this charge should be severed because it had no legitimate relevance to the October 13 crime. And the government did not include it in its list of impeachable convictions or prior bad acts when Mr. Pitt was considering whether or not to testify. Thus, Mr. Pitt was entitled not to mention the October 6 burglary at trial.

_____

(. . . continued)

out on direct examination damaging information about the defendant and his witnesses, with the attendant protection of an appropriate cautionary instruction as to its limited use by the jury, if such is requested by counsel").

In short, simply by exercising his right to testify in his defense, admitting prior offenses, and denying the commission of the charged crime, Mr. Pitt did not open the door to any sort of impeachment as to his criminal character.

**II.     The Trial Court Incorrectly Ruled That Mr. Pitt's Not-Guilty Narrative Could Be Impeached with Propensity Evidence.**

Even assuming that Mr. Pitt had put his criminal character at issue by exercising his right to testify in his defense, that testimony would not have given the government license to impeach Mr. Pitt with propensity evidence. To begin with, any misimpression Mr. Pitt might have given the jury on direct could have been addressed by other means. As we cautioned in *Mercer v. United States*, 724 A.2d 1176, 1192 (D.C. 1999), "opening the door is one thing. But what comes through . . . is another. Everything cannot come through the door." Here, defense counsel, as a fallback argument, twice proposed a more limited alternative to impeaching Mr. Pitt with the October 6 burglary; she suggested that the government correct any misimpression that Mr. Pitt was "just a fence" by asking him on cross-examination both if he had stolen property himself and if, at the time of his arrest on October 13, he possessed property he personally had stolen.[5] The

---

[5] Defense counsel arguably conceded too much by agreeing to the second question. *See Jones v. United States*, 385 A.2d 750, 753 n.2 (D.C. 1978) ("[O]nly

(continued . . .)

court acknowledged that this was a curative option at an ex parte bench conference with the government.[6]  And the government employed it.  *See infra* note 13.  Nonetheless, the court ultimately, incorrectly, authorized the government to question Mr. Pitt about the October 6 burglary.  And the court authorized the government to use the October 6 burglary not for the purpose of challenging any misrepresentation by Mr. Pitt of his criminal character, but rather to impeach Mr. Pitt's not-guilty narrative using a propensity chain of reasoning.  This too was error.

A. **The Trial Court Ruled That the Government Could Impeach Mr. Pitt's Narrative That He Had Not Committed the October 13 Rape and Burglary with the October 6 Burglary Using a Propensity Line of Reasoning.**

Notably, my colleagues do not defend the court's actual ruling.  Instead, they assert that the trial court ruled that Mr. Pitt could be impeached with the October 6

—————————————————

(. . . continued)
after the defendant has introduced evidence of his good character may the government in rebuttal offer evidence of bad character.  Such evidence is confined to that of general reputation.  Consequently, specific incidents in the life of the accused may not be shown, but only his reputation in the community." (internal quotation marks omitted)).

[6]  The court observed:  "Well, if he just agrees 'I'm not just a fence,' then you can't go into the burglary."  And the government concurred, "Right."  The Majority Opinion does not acknowledge this exchange or make any mention of this ex parte bench conference although it spans fifteen pages of transcript.

burglary on a nonpropensity basis. *Ante* at 28–30, 37 n.54. The record establishes otherwise. The court and counsel engaged in a lengthy discussion over two days and more than 100 pages of transcript as to whether impeachment with propensity evidence was permissible. As my colleagues acknowledge, this discussion "led to" the court's ruling. *Ante* at 25 n.30. The trial court itself expressly incorporated this discussion by reference before it ruled that Mr. Pitt's testimony that he was not guilty of the October 13 burglary and rape could be impeached with his commission of the October 6 burglary by a chain of reasoning that rested on a propensity inference.

As the government was the proponent of a line of cross-examination about a charge that had already been severed from the case (after conceding it was not admissible under *Drew*), it was the government's burden to establish the relevance of this prior bad act.[7] The government struggled to identify a nonpropensity chain of reasoning for impeachment, and ultimately conceded defeat.

As articulated by one of the trial assistants, the government's impeachment rationale was that "Antwon Pitt has said he fences. The information the

---

[7] The government does not dispute this on appeal. Without explication, my colleagues in the Majority, however, focus almost exclusively on defense counsel's arguments in opposition to the government's arguments. *Ante* at 8–12.

[g]overnment has with respect to these two incidents is that he burglarizes. So, I think that rebutting this claim in that regard[,] to not just say [']well, don't you also burgle,' we're saying you're not telling the truth on the stand." But, as the defense repeatedly pointed out, this was impeachment with a propensity inference: "You're saying it's less likely [that Mr. Pitt was an innocent bystander to the October 13 burglary] because he did it before [on October 6]"; "the impeachment is you're lying about A because you have done A in the past, [and] that's propensity." The defense then memorialized its propensity objection in a written motion, in which it explained that "[a] defendant does not open himself to impeachment with propensity evidence simply by testifying[,]" and argued that "[t]o permit the government to prove that [Mr. Pitt] committed a separate burglary for the purpose of proving that he likely got [the complainant's] cell phone in a burglary is propensity pure and simple, and just as impermissible now as it was in the government's case-in-chief."[8]

---

[8] My colleagues in the majority initially acknowledge defense counsel's repeated objections to any questioning of Mr. Pitt about the October 6 burglary because its relevance turned on an impermissible propensity inference. *See ante* at 8–9. But they subsequently assert that "defense counsel's specific objections to impeachment before and after [the trial court's] ruling *were all* aimed at limiting the use of the 'extrinsic' or physical evidence from the October 6 burglary." *Ante* at 34 n.47 (emphasis added). This characterization of defense counsel's argument is unsupported by the record.

The government eventually conceded in open court that the relevance of the October 6 burglary was based on a propensity inference:

| AUSA: | It's not that he's simply a fence. It's not that he's a fence at all. |
| Court: | I think that's propensity because you're saying he burgled this place because he burgled that place. |
| AUSA: | It's undermining the credibility of his claim. I think that goes to his credibility on that issue. It's not to say— |
| Court: | I think that's propensity too, right? |
| AUSA: | Of course it's propensity. Of course it has that aspect to it that if [you] burgled once, you're likely the person who burgled again. |

The government reiterated this concession at the ex parte bench conference, see *supra* note 4, in which the court asked the government to address "exactly how it propose[d] to cross examine [Mr. Pitt]." The court observed that "[i]t seems to me it impeaches the whole story for him to say 'I'm innocently outside with the phone' when a week before he went and burglarized a house and got a phone . . . [but] the rules of evidence just generally say propensity evidence is not permitted." The government admitted, "[y]es, it is propensity," but then argued such propensity evidence could be used as impeachment.

The trial court accepted that the government was seeking to rely on a propensity chain of reasoning to argue that Mr. Pitt's "whole story is less believable in this case because of the [October 6 burglary]." The record is replete

with statements by the court expressing this understanding of the government's intended impeachment. The court noted the October 6 burglary "is propensity because you're saying he burgled this place because he burgled that place"; observed that "the value of the [October 6] burglary is you're less likely to be standing outside just receiving a phone on this case if in [the] past you've gone in and gotten the phone yourself[,] which is propensity"; acknowledged that the "relevan[ce]" of the stolen phone in Mr. Pitt's backpack was that it made it less "likely to me that he just got this phone from [his cousin] when he has gotten another phone that he himself stole in somebody's bedroom"; reiterated that "the main value is just that if he himself is burglarizing places and coming up with a cell phone . . . it makes [it] less likely that he [was doing] something different on this occasion"; and bluntly stated "it's impeachment with propensity."

In short, there was no confusion, on the part of the litigants or the trial court, as to the issue presented; the question the court "wrestl[ed]" with, *ante* at 25, was whether impeachment of Mr. Pitt's not-guilty narrative with propensity evidence was permitted:

- [Y]ou can call it propensity, but it [is] also impeachment and does it matter if it's propensity if it's impeachment[?] That is my question.
- I think the rules of evidence just generally say propensity evidence is not permitted and I'm hesitant on that theory which to me i[s] the most logical theory, but I don't know if it's permissible.

- The value of the burglary is you're less likely to be standing outside just receiving a phone [i]n this case if in [the] past you've gone in and gotten the phone yourself[,] which is propensity. My question is whether that's permissible or not permissible propensity. . . . I'm not sure.

- I need to look at this impeachment with propensity issue. . . . I keep coming back to the same thing. I think it's probative. I just don't know that it's lawfully probative[.]

- I just want to confirm my view of whether impeachment is enough to justify using propensity[.]

- I want to . . . study whether impeachment with propensity is permissible.

- I'm trying to figure out whether [impeachment with propensity evidence is] permissible or not.

When the court ruled, it did not disavow as "tentative" or "exploratory," *ante* at 25, its identification of the core issue—the propriety of impeaching Mr. Pitt's not-guilty narrative with propensity evidence—in its extended discussion with counsel about whether the government could question Mr. Pitt about the October 6 burglary. Instead, the court expressly incorporated this discussion by reference, noting, "I'm going to rely on the analysis of impeachment which we've been discussing."

In its ruling, the trial court first set out both the details of Mr. Pitt's not-guilty narrative.[9] The court then set out the information the government "s[ought]

---

[9] The court noted:

(continued . . .)

to introduce" to impeach Mr. Pitt, namely that "on October 6, 2015, about a week before the events in this case, the Defendant committed a burglary at approximately [5] or 6 a.m. in which he entered another[] woman['s] room while she was sleeping. She awoke. He took her cell phone and left." The court ruled that because "the facts of the other burglary tend to undermine the veracity of what

_____

(. . . continued)

> Defendant has testified that on the day in question [10/13/15] he was in the company of his cousin Delonte Pitt. The Defendant testified in relevant part that as he and Delonte were walking to the Metro just after two p.m., they passed [the victim's] apartment building and Delonte said he wanted to go inside to see his man and told the Defendant to wait outside. Delonte then went inside the building for about 20 minutes; came out and gave the Defendant a cell phone and some checks. We now know that these items belong to [the victim] and her husband. The Defendant said that Delonte asked him to sell these items; that he had sold stolen items for Delonte in the past; that he did not ask Delonte where he got the items and assumed they were stolen and that he sells items for Delonte; takes a share of the proceeds and gives the rest of the proceeds to Delonte.
>
> The Defendant also testified that he was concerned Delonte had done something bad because Delonte was acting sketchy and paranoid; that the Defendant tried to disguise his own appearance; tried to sell the cell phone that day and tried not to get his fingerprints on the cell phone. He also testified that when the police confronted him at a convenience store later that night, he fled because he was on probation and believed he had just assaulted a police officer and also was this possession of stolen property.

[Mr. Pitt] is saying now"—"the veracity of the testimony in this case"—they were "admissible under the impeachment theory." The court acknowledged that "this might also be about propensity, but it's permissible because it's legitimate impeachment."[10] The court then concluded that this line of impeachment with propensity evidence was more probative than prejudicial.

Any possibility of confusion as to the scope of the court's impeachment ruling was erased before closing arguments, when the government confirmed with the court that it was permitted to use the October 6 burglary to challenge the veracity of Mr. Pitt's not-guilty narrative based on a propensity inference:

> AUSA: Your Honor, just so we can clarify, the government is permitted to argue that it's not credible that the Defendant just received the property in this case on October 13th because of the fact that he went into a woman's home on the 6th and in fact took the property himself and that therefore the jury can use that to assess that it's not credible telling them regarding the 13th?
>
> Court: I think it was admitted to assess the credibility of his testimony and the overall circumstances of how he got the phone in this case, and I think you can argue it if you argue it in a way that goes to the credibility of the story.

---

[10] The Majority opinion suggests that because the trial court noted that it had reviewed "all of the cases" before it ruled, the court must have admitted the October 6 burglary on a nonpropensity basis. *Ante* at 25 n.30. But the fact that the cases the court purported to rely on do not allow the admission of propensity evidence as impeachment, *see infra*, simply demonstrates that the court's ruling to the contrary was incorrect, not that the trial court did not so rule.

So, I mean, I know we've been discussing it at length, so I think you can. What you can't do is say he committed the burglary the first time and therefore you can conclude he committed the burglary the second time. I think we want to make sure that we're addressing credibility here. How believable it is he's telling you whatever in light of the fact that there's this other incident that he agreed and admitted to, okay?

My colleagues' determination that the trial court ruled that there was a "propensity-free" basis to impeach Mr. Pitt, *see ante* at 9–11, 31, 37 n.54, is thus mistaken. The sole support for this understanding appears to be a comment by the trial court before it ruled, where it pushed back against the defense's "repeated characterization" of the October 6 burglary as "propensity," *ante* at 9–10, because the court found this was not "helpful to the analysis" of whether impeachment with propensity evidence was permissible. But on that question, as discussed above, the record is clear—the court ruled the government could do this.[11]

---

[11] My colleagues state that the trial court left open an opportunity to the defense to continue to challenge the government's efforts to impeach Mr. Pitt with the October 6 burglary, and that the defense "made a tactical choice to forgo further objection" to this line of impeachment. *Ante* at 34; *see also id.* at 12, 33–34 & n.47. Any suggestion that Mr. Pitt has not preserved his challenge to his impeachment with propensity evidence cannot be reconciled with the record and defense counsel's manifestly zealous advocacy to keep propensity evidence out of her client's trial. Presumably for this reason, the government has not made this argument.

As noted above, the court acknowledged before it ruled that the government had asked to put detailed facts about the October 6 burglary before the jury. It then

(continued . . .)

―――――――――――――――――――――――
(. . . continued)

determined that "*the[se] facts of the other burglary*," were "admissible under the impeachment theory." (emphasis added)  The only reasonable understanding of the trial court's ruling is that it gave the government full permission to do what it had asked.  Defense counsel did not "forego further objection," *ante* at 34; having argued about the propensity issue for an "entire day" of trial, filed a written motion that evening, and then renewed her opposition the following day; counsel understood the court's ruling that the government could ask Mr. Pitt about the October 6 burglary to foreclose further argument.  Counsel cannot reasonably be faulted for not carrying on the fight thereafter.  And what the Majority Opinion characterizes as defense counsel's "full[] embrace[ of] the irrelevant details of the October 6 burglary for his own advantage," *ante* at 34, was merely counsel's after-the-fact attempt to make the best of a very bad ruling for her client.

To support its determination that defense counsel never objected to questioning about the October 6 burglary, the Majority Opinion ignores the record, see *supra* 58–59 & n.8, however, and relies on an inapposite coda to the court's ruling that Mr. Pitt could be impeached with the details of the October 6 burglary, where the court told counsel it would wait to determine the extent to which the government could present "*extrinsic evidence*" of this crime.  Consistent with this ruling, after Mr. Pitt admitted on cross-examination to possessing stolen property at the time of his arrest, defense counsel objected to the government's moving into evidence specific stolen items Mr. Pitt was carrying at the time of his arrest in his backpack.  Although the court recognized that Mr. Pitt could not be "impeached" at this point with extrinsic evidence of the previously stolen goods because he had not denied either that he had these items or that they were stolen, the court admitted these physical items as "relevant" evidence nonetheless.

Whether this ruling was correct is a distinct issue that, although preserved, has not been pressed on appeal.  *See ante* 34 n.46.  Thus, neither of the parties in their briefs even take note of the court's qualifying statement about the introduction of "extrinsic evidence," much less identify this statement as having any bearing on our analysis of the issue actually before us, i.e., whether Mr. Pitt was properly impeached with the October 6 burglary based on a propensity chain of reasoning.

**B.    The Trial Court Erred When It Ruled That Mr. Pitt's Narrative of Innocence Could Be Impeached with Propensity Evidence.**

Because my colleagues in the Majority fail to ground themselves in the record, they never address the issue presented by this case:   whether the government may impeach a defendant who testifies that he is not guilty with propensity evidence.  The answer to this question is clear:  the government may not do this.

"Th[e] exclusionary principle, sometimes referred to as the 'propensity rule,' is of ancient origin." *Thompson v. United States*, 546 A.2d 414, 418 (D.C. 1988). "It is the product of that same humane and enlightened public spirit which, speaking through our common law, has decreed that every person charged with the commission of a crime shall be protected by the presumption of innocence until he has been proven guilty beyond a reasonable doubt." *Id.* (internal quotation marks omitted).  It also reflects the "fundamental principle[] of our legal system[] [that] a person is tried only for those crimes with which he has been charged," "not for bad character or predisposition." *Pounds v. United States*, 529 A.2d 791, 794 n.3 (D.C. 1987).  The "obvious danger" that arises when a jury is allowed to hear about "a defendant's unrelated past behavior . . . [is] that the jury will infer a disposition on the part of the defendant toward criminal activity and thus find him guilty of the

crime charged." *Campbell v. United States*, 450 A.2d 428, 430 (D.C. 1982). Thus, courts strictly regulate the information we allow a jury to hear about prior bad acts, and if a prior bad act is relevant to the defendant's guilt of the charged crime only via an inference of propensity, it is inadmissible as a matter of law. *See Jenkins v. United States*, 80 A.3d 978, 998 (D.C. 2013) (explaining that "evidence of an uncharged crime is inadmissible for the purpose of proving the defendant's criminal disposition"); *Harrison v. United States*, 30 A.3d 169, 176 (D.C. 2011) ("[E]vidence of prior bad acts independent of the crimes charged is inadmissible to show the defendant's disposition or propensity to commit the charged offenses, from which the jury improperly could infer the defendant actually did commit them."); *Thompson*, 546 A.2d at 418 ("It is a principle of long standing in our law that evidence of one crime is inadmissible to prove *disposition* to commit crime, from which the jury may infer that the defendant committed the crime charged." (quoting *Drew*, 331 F.2d at 89)); *Dorman v. United States*, 460 A.2d 986, 989–91 (D.C. 1983) (Ferren, J., dissenting) (noting that "[prior convictions] are, of course, inadmissible to show a general criminal disposition" (internal punctuation omitted)).

There is no exception to the propensity rule for impeachment. *See Jones v. United States*, 385 A.2d 750, 753 (D.C. 1978) (explaining that "appellant's

decision to take the stand did not open the door . . . for use of otherwise improper evidence, even for impeachment"). The government may impeach a defendant with a prior bad act, but not if doing so requires the use of a propensity inference. *See, e.g.*, *United States v. Gomez*, 763 F.3d 845, 856 (7th Cir. 2014) (en banc) (holding evidence must be excluded "if its relevance to another purpose is established *only* through the forbidden propensity inference" (internal quotation marks omitted)).[12]

Likewise, the Majority Opinion cites no authority that supports the trial court's actual ruling that a testifying defendant may be impeached with propensity evidence. The innocent presence cases my colleagues identify, *ante* at 19 n.18 (citing *Flores v. United States*, 769 A.2d 126 (D.C. 2000), *Kinard v. United States*, 635 A.2d 1297 (D.C. 1993), and *Jones v. United States,* 548 A.2d 35 (D.C. 1988)), do not support this proposition. In *Flores* and *Jones*, we upheld the use of a prior bad act to impeach a defendant *without* reliance on a propensity inference. In both

_____

[12] The government concedes this on appeal and acknowledges that evidence of prior bad acts should be "exclude[d] . . . if its relevance to another purpose is established *only* through the forbidden propensity inference." Accordingly, the government looks to alternate grounds to try to defend the court's ruling. First, the government tries to renew for a second time the *Drew* argument that it had abandoned prior to trial—which the trial court rejected and the Majority Opinion affirms, *ante* at 18. Second, the government now suggests that the October 6 burglary was impeaching for a nonpropensity reason, but this argument is contrary to its concession at trial. See *supra* Part II.

cases, the government introduced evidence of a prior positive drug test to impeach the defendant's testimony that he was unfamiliar with or had never seen cocaine—not to show that it was more likely that the defendant, having used drugs, was guilty as charged of selling them. 769 A.2d at 131–32; 548 A.2d at 39. In *Kinard*, an ineffective assistance of counsel case, we acknowledged generally that a defendant who raises an innocent presence defense may be cross-examined about the particulars of that defense, 635 A.2d at 1306, but we did not hold that a defendant can be impeached with a propensity inference. Indeed, we determined that the evidence challenged on appeal as inadmissible prior bad acts evidence (defendant's possession of a gun immediately prior to a shooting) was "not other crimes evidence subject to the strictures of *Drew*"; rather it was "admissible to prove that the defendant had the means of committing the crime charged." *Id*. at 1304.

It was thus error for the trial court to permit the government to impeach Mr. Pitt's not-guilty narrative with the October 6 burglary and to argue that he must be guilty because he is the kind of person who burgles homes. *See Harrison*, 30 A.3d at 178–80 (noting that evidence dependent "wholly or primarily" on a propensity inference is inadmissible, and reversing and remanding for a new trial

where the court could "not perceive how else the jury could have used the evidence" (internal quotation marks omitted)).[13]

## III.    The Trial Court's Erroneous Ruling Requires Reversal.

In evaluating the erroneous admission of prior-crimes evidence, we must reverse unless we find it "*highly probable* that [the] error did not contribute to the

---

[13]  Because the October 6 burglary had no legitimate relevance to this case, there is no need to weigh the probity of this evidence against its prejudicial effect. *Ante* at 31–36.  But even assuming the October 6 burglary had some nonpropensity value, it easily met the test for preclusion under such a balancing test.  This is particularly so where, as discussed above, the government could have impeached any "just-a-fence" misimpression Mr. Pitt may have conveyed on direct with a far more limited line of questioning.  *See Campbell*, 450 A.2d at 431 (noting "the government's need for the evidence was minimal" where "other means of proof" were available).

And indeed, *before* it took the additional step of asking Mr. Pitt about the October 6 burglary, the government confirmed that Mr. Pitt was not "just a fence." My colleagues in the majority express dissatisfaction with Mr. Pitt's response to the government's question, describing it as "cryptic," *ante* at 25 n.29, but Mr. Pitt was just parroting the government's language:

USAO:    What I'm asking you is if you're the person that gets the stuff *from other people*? That someone else does the job and they give it to you; is that right?

Mr. Pitt:    If you asking me did I receive these [sic] property *from other people*, I would tell you no.

(emphasis added).   If the government thought this answer was unclear, it could have asked a follow-up question.  Instead it immediately proceeded to ask Mr. Pitt about the October 6 burglary.

verdict." *Wilson-Bey v. United States*, 903 A.2d 818, 844 (D.C. 2006) (internal quotation marks omitted); *Thomas v. United States*, 59 A.3d 1252, 1262 (D.C. 2013). Such a determination cannot be made in this case.

First, we must consider the evidence the government presented which was strong, but by no means overwhelming. Because the victim could not identify her attacker, the government sought to prove Mr. Pitt's guilt with entirely circumstantial evidence—video footage from a surveillance camera showing Mr. Pitt in the area around the time of the crime, his possession of the property stolen from the victim, and his possession of gloves bearing both his and the victim's DNA—all of which his testimony accounted for.[14]

Second, it is important to focus on what the government asked the jury to consider in assessing the credibility of his not-guilty narrative. In a case where Mr. Pitt was accused of breaking into the complainant's apartment, raping her, and stealing various personal items, the government brought out chilling details of

---

[14] The government's reliance on the trial court's assessment at sentencing of the strength of the evidence against Mr. Pitt is misdirected; this assessment included the propensity evidence, which the court had erroneously admitted. In any event, the record speaks for itself. The government was unable to present evidence definitively placing Mr. Pitt in the victim's apartment, and the jury struggled with this case, sending at least one note indicating difficulty in reaching a verdict before it ultimately convicted Mr. Pitt.

another crime committed just a week earlier. The government asked Mr. Pitt if it was true that, on October 6, 2015, he "went inside of [another woman's] home," (whom the government identified by name) "early in the morning" and took her wallet, her cellphone, and other items "from her bedroom while she was sleeping." The government concluded its cross-examination of Mr. Pitt with this line of questioning. Notably, when the government later tried to characterize its impeachment of Mr. Pitt with the October 6 burglary as conducted "for a very limited purpose," (in an effort to constrain defense counsel's closing argument) the court responded with "shock." The court observed that "the specific purpose brought in all of the relevant facts of that burglary[:] He entered the woman's apartment. She was sleeping. She woke up. He took her cell phone and he left." The court further observed these facts were "helpful to the [g]overnment's case" because it undermined "the credibility of [Mr. Pitt's] testimony and the overall circumstances of how he got the phone in this case."

The government then highlighted the October 6 burglary in closing, specifically in its rebuttal argument. The government emphasized to the jury that Mr. Pitt had "seven days earlier . . . entered a person's home, stolen property from that person and that seven days later he still had that [property] in his backpack." It argued that Mr. Pitt's defense that he was just acting as a fence for his cousin in

this case did not hold water because he had been "forced to admit . . . that he had in fact burglarized a home a week earlier." In other words, in its final words to the jury, the government argued that Mr. Pitt's not-guilty narrative should not be believed because he had a propensity to commit burglaries.

Third, we must consider if the trial court in any way mitigated the prejudice from the injection of this propensity evidence into Mr. Pitt's case. It did not. Far from curing the prejudice from the admission of this propensity evidence and the government's argument, the trial court's jury instructions reinforced it. The trial court told the jury that evidence of the October 6 burglary "was admitted for the limited purpose of impeaching [Mr. Pitt's] credibility," and could only be used by the jury for that purpose. *Ante* at 15 n.10. But as the trial court found and the record in this case makes clear, the only way the October 6 burglary impeached Mr. Pitt's credibility was through a forbidden propensity inference. See *supra* Part II.A.

We exclude propensity evidence precisely because "it is said to weigh too much with the jury and to so overpersuade them." *Thompson*, 546 A.2d at 418 (internal quotation marks omitted). "The natural and inevitable tendency of the tribunal—whether judge or jury—is to give excessive weight to the vicious record

of crime thus exhibited, and either to allow it to bear too strongly on the present charge, or to take the proof of it as justifying a condemnation irrespective of guilt of the present charge." *Id.* at 418–19 (internal quotation marks omitted). Here, where the government put before the jury specific details of a burglary committed just one week prior to the charged crime and nothing was done to check the jury's reliance on an inference that Mr. Pitt had a propensity to commit burglaries, it is impossible to determine that it was "highly probable" that this line of questioning had no effect on the outcome of this case.

\*            \*            \*

Because of the centrality of the propensity rule to the presumption of innocence, and the principle that a person is tried only for those crimes with which the person has been charged, courts "must . . . be alert to [all] modes of [its] evasion." *Thompson*, 546 A.2d at 420. "In general, the rule should not be applied in a parsimonious spirit, and courts must view with a jaundiced eye evidence purportedly offered as relevant to some other issue but in reality bearing wholly or primarily on the defendant's predisposition to commit another similar crime." *Id.* Similarly, courts should be wary of attempts to admit "evidence otherwise inadmissible" on a claim that "the defense has opened the door," out of concern that such practice could "be used unfairly to prejudice the defendant." *Mercer*, 724

A.2d at 1192 (internal quotation marks omitted). Adherence to these principles may be difficult when the government seeks a conviction for a crime that is especially disturbing, and "arouse[s] the passions of a community," *Irvin v. Dowd*, 366 U.S. 717, 729 (1961) (Frankfurter, J., concurring), but that is when it is most important. Because the Majority Opinion endorses a departure from these principles, I respectfully dissent.